1  BILAL A. ESSAYLI
   United States Attorney
2  LINDSEY GREER DOTSON
   Assistant United States Attorney
3  Chief, Criminal Division
   BRETT A. SAGEL (Cal. Bar No. 243918)
4  Assistant United States Attorney
   RANEE A. KATZENSTEIN (Cal. Bar No. 187111)
5  Assistant United States Attorney
   Criminal Appeals Section
6       Ronald Reagan Federal Building
        411 West Fourth Street, Suite 8000
7       Santa Ana, California 92701

8       1000 U.S. Courthouse
        312 N. Spring Street
9       Los Angeles, CA 90012

10      Telephone:  (714) 338-3598/(213) 894-2432
        Facsimile:  (714) 338-3708/(213) 894-8513
11      Email:      Brett.Sagel@usdoj.gov
                    Ranee.Katzenstein@usdoj.gov
12
   Attorneys for Plaintiff
13 UNITED STATES OF AMERICA

14                   UNITED STATES DISTRICT COURT

15               FOR THE CENTRAL DISTRICT OF CALIFORNIA

16 UNITED STATES OF AMERICA,        SA CR No. 19-061-JVS

17            Plaintiff,            GOVERNMENT'S SENTENCING POSITION
                                    AND OBJECTIONS AND RESPONSE TO THE
18                                  REVISED PRESENTENCE REPORT AND
                v.                  RECOMMENDATION LETTER DISCLOSED ON
19                                  APRIL 18, 2025, FOR DEFENDANT
   MICHAEL JOHN AVENATTI,           MICHAEL JOHN AVENATTI; MEMORANDUM
20                                  OF POINTS AND AUTHORITIES;
              Defendant.            EXHIBITS
21
                                    SENTENCING HEARING:
22                                  Date: May 27, 2025
                                    Time: 9:00 a.m.
23

24

25      Plaintiff, United States of America, by and through its counsel

26 of record, the United States Attorney for the Central District of

27 California and Assistant U.S. Attorneys Brett A. Sagel and Ranee A.

28 Katzenstein, hereby files its sentencing position and objections and

response to the Revised Presentence Report and Revised Recommendation

Letter, both disclosed on April 18, 2025 (CR 1199, 1198), for

defendant Michael John Avenatti.

The government's sentencing position is based upon the attached

memorandum of points and authorities; the attached declaration and

exhibits thereto; the victim impact statements previously lodged

under seal and provided at defendant's original sentencing on

December 5, 2022; the files and records in this case, including the

evidence and testimony at trial as well as the evidence, briefing,

and hearing for defendant's original sentencing; and such further

evidence and argument as the Court may permit at the sentencing

hearing.

 Dated: May 6, 2025                    Respectfully submitted,

                                       BILAL A. ESSAYLI
                                       United States Attorney

                                       LINDSEY GREER DOTSON
                                       Assistant United States Attorney
                                       Chief, Criminal Division


                                            /s/
                                       _____
                                       BRETT A. SAGEL
                                       RANEE A. KATZENSTEIN
                                       Assistant United States Attorneys

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                                      PAGE

MEMORANDUM OF POINTS AND AUTHORITIES..................................3

I.   INTRODUCTION.....................................................3

II.  GOVERNMENT'S GUIDELINES CALCULATION AND RESPONSE TO THE PSR....6

     A.   Sentencing Guidelines......................................7

          1.   Summary...............................................7

          2.   Uncontested Guideline Enhancements....................7

          3.   Obstruction of Justice...............................10

          4.   Loss.................................................14

          5.   Restitution..........................................21

     B.   Criminal History..........................................22

III. A SENTENCE OF 216 MONTHS (CURRENT WITH THE 48 MONTHS
     IMPOSED IN THE CLIFFORD CASE) IS REASONABLE AND APPROPRIATE
     BASED ON THE 3553(A) FACTORS..................................23

     A.   Overview..................................................23

     B.   Nature and Circumstances of the Offenses (§
          3553(a)(1))...............................................24

     C.   History and Characteristics of Defendant (§
          3553(a)(1))...............................................30

     D.   Post-Conviction Conduct By Defendant......................32

     E.   The USPO's Sentencing Recommendation Is Factually and
          Legally Flawed............................................34

IV.  CONCLUSION.....................................................35

**TABLE OF AUTHORITIES**

Page(s)

<u>Cases</u>

<u>Gall v. United States,</u>
   552 U.S. 38 (2007) .............................................. 27

<u>United States v. Cruz-Gramajo,</u>
   570 F.3d 1162 (9th Cir. 2009) .................................. 25

<u>United States v. Garro,</u>
   517 F.3d 1163 (9th Cir. 2008) .................................. 14

<u>United States v. Halamek,</u>
   5 F.4th 1081 (9th Cir. 2021) ................................... 7

<u>United States v. Hinkson,</u>
   585 F.3d 1247 (9th Cir. 2009) .................................. 7

<u>United States v. Johnson,</u>
   812 F.3d 757 (9th Cir. 2016) ................................... 14

<u>United States v. Rizk,</u>
   660 F.3d 1125 (9th Cir. 2011) .................................. 24

<u>United States v. Tat,</u>
   97 F.4th 1155 (9th Cir. 2024) .................................. 6

<u>United States v. Valle,</u>
   940 F.3d 473 (9th Cir. 2019) ................................... 7

<u>Statutes</u>

18 U.S.C. § 1343............................................... 2, 5

18 U.S.C. § 3553(a)......................................... passim

18 U.S.C. §§ 875(d)............................................. 4

18 U.S.C. §§ 3664(f)(1)(B)..................................... 24

26 U.S.C. § 7212.............................................. 2

<u>Rules</u>

U.S.S.G. § 2B1.1........................................... 15, 32

U.S.S.G. ¶ 4A1.2(a)(1)........................................ 25

USSG § 2B1.1(a)(1)..............................................7

USSG § 2B1.1(b)(1)(K)...........................................7

USSG § 2B1.1(b)(9)(B).........................................8, 9

USSG § 2B1.1(b)(10)(C).......................................8, 11

USSG § 3A1.1(b)(1)...........................................8, 11

USSG § 3B1.3.................................................8, 11

USSG § 3C1.1.....................................8, 12, 14, 15

USSG § 4A1.3(a)(1)..............................................25

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Defendant Michael John Avenatti is due to be re-sentenced after remand from the Ninth Circuit[1] on his pleas of guilty to four counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of obstructing the due administration of the internal revenue laws, in violation of 26 U.S.C. § 7212.

Defendant, a disbarred plaintiff's attorney, chose to steal from his clients and lie to them for years instead of advocating for them. Defendant lied about the true terms of the settlement agreements he had negotiated for his clients, concealed the settlement payments that the counterparties had made, secretly took and spent the settlement proceeds that belonged to the clients, and lulled the clients into not complaining or investigating further by providing small "advances" on the supposedly yet-to-be paid funds.  Through this multi-year fraudulent scheme, defendant stole millions of dollars from his vulnerable clients causing them to suffer substantial financial hardship.[2]

Defendant was also a tax cheat.  Defendant failed to file Forms 941 and pay payroll taxes for Global Baristas US LLC ("GBUS"), and then willfully obstructed the Internal Revenue Service's ("IRS") efforts to collect the amounts due.  Defendant obstructed the IRS, by, among other means: making false statements to the revenue

---

[1] United States v. Michael John Avenatti, No. 22-50301, Dkt 52-1, Memorandum Disposition dated October 23, 2024 ("Mem. Dispo.").

[2] A detailed description of this scheme is set out in paragraphs 28-90 of the Revised Presentence Report ("RPSR"). For this reason, and because the Court heard the evidence presented at the trial on Counts 1-10 and conducted a thorough sentencing hearing in December 2022, this memorandum does not include a full recitation of the facts of the wire fraud scheme.

3

officer; directing employees to stop depositing cash receipts; and changing the company name, Employer Identification Number, and bank account information listed with his credit card processing company to avoid IRS levies.[3] (RPSR ¶ 100.)  In addition, defendant failed to file individual (Forms 1040), partnership for Eagan Avenatti, LLP ("EA LLP") (Forms 1065), or corporate for Avenatti & Avenatti ("A&A") (Forms 1120) tax returns or pay taxes over multiple years and failed to file and pay payroll taxes for EA LLP. (RPSR ¶¶ 192-197.)

Defendant's scheme to defraud his clients was cruel -- often reducing those clients to begging for needed funds and making them feel beholden to him when he "advanced" or "loaned" them funds that were, in fact, the clients' own money; callous -- blaming and disparaging the supposedly derelict counterparties for the "missing" money that defendant himself had stolen; and calculating -- with defendant exploiting his knowledge of the legal system to conceal his thefts by falsely telling his victims that the settlements were confidential and dire consequences would follow if they discussed their cases with anyone other than defendant.  Defendant's tax fraud scheme was massive, resulting in losses to the federal treasury of over $3.2 million from just the failure to pay GBUS payroll taxes.

At the original sentencing, the Court considered "the Sentencing Guidelines, the policies of the Sentencing Reform Act of 1984, 18 U.S.C. § 3553(a), and the specific facts of this case," and determined that the appropriate sentence was 168 months on top of the 60 months defendant had been sentenced to in his two New York cases.

---

[3] The RPSR contains a detailed description of defendant's obstruction of the tax laws at paragraphs 91-100.

4

(CR 1053 (Court's Sentencing Memorandum) at 1.)[4]  Explaining why this sentence was appropriate and necessary to achieve the goals of sentencing in this case, this Court stated:

> As is the case with most human beings, there is the ability to do great good on an individual level or even a national or global scale. But there is also the ability to do great evil through willfully inflicting great harm on others through greed, arrogance, lying, uncaring dealing with others and blind-sightedness. . . . Avenatti has done many noble and good things in his life, . . . [b]ut he has also done great evil for which he must answer. His actions in this case and in the relevant conduct show an abandonment of some of the most basic principles of fairness. . . . It is now time for him to pay his debts to his victims, the Government, and to society in general.

(CR 1053 at 20.)  The Court's observations have as much force now as they had at the original sentencing. Defendant's egregious violations of his duties and the trust placed in him by his clients, his infliction of great harm by stealing millions of dollars from them, and his greed and arrogance leading to the calculated choices and deception that he carried out for years against his clients and the IRS, all remain the same. Indeed, as detailed below, defendant claimed at his original sentencing that he was "deeply sorry" for his conduct and would "work tirelessly" to help his victims recover monies they "lost," yet defendant actually objected to his victims

---

[4] In May 2019, defendant was charged in New York with making interstate threats with the intent to extort, attempted extortion, and honest services wire fraud, in violation of 18 U.S.C. §§ 875(d), 1951, and 1343, 1346.  (19-cr-373-PGG (SDNY) (the "Nike Case").)  The charges arose from defendant's wrongful use of confidential information provided by a client to extort Nike, Inc., into paying defendant at least $15 million.  (RPSR ¶ 201.) Also in May 2019, defendant was charged in a separate case in New York with wire fraud and aggravated identity theft, in violation of 18 U.S.C. §§1343 and 1028A. (19-cr-374-JMF (SDNY).)  Those charges arose from defendant's theft of a part of an advance on a book contract he secured for his client Stephanie Clifford, whose stage name is Stormy Daniels. (RPSR ¶¶ 84-90, 202 (the "Clifford Case").)

recovering money from third-parties, including an objection he made on the very same day as his initial sentencing hearing.

The seriousness of defendant's crimes, the deleterious impact -- both financial and emotional -- on the victims, the other aggravating factors, and the need for specific and general deterrence call for a significant sentence.  Defendant's advisory United States Sentencing Guidelines ("USSG") range is 188 to 235.  (RPSR ¶ 322.)  The Ninth Circuit has determined that the conduct in the Clifford Case is relevant conduct for the instant offenses, and therefore, the sentence in this case should be concurrent with the sentence imposed in that case. Accordingly, and as set forth more fully below, the government submits that a sentence of 208 months, reduced by 40 months (the portion of the Clifford Case sentence already served) and running concurrent to the remaining 8 months of that sentence is appropriate and necessary to achieve the goals of sentencing in this case. This sentence would result in a total of 160 months consecutive to the sentence in the New York cases.

## II.  GOVERNMENT'S GUIDELINES CALCULATION AND RESPONSE TO THE PSR

The United States Probation Office ("USPO") disclosed the RPSR on April 18, 2025 (CR 1199).  Although the resentencing will be plenary, see United States v. Tat, 97 F.4th 1155, 1160-62 (9th Cir. 2024), the Court should include all of the previously imposed guidelines enhancements with the sole exception that the enhancement for loss should be a eighteen levels, rather than twenty.  The government thoroughly briefed the underlying guideline calculations prior to defendant's initial sentencing hearing, and the Court made extensive findings regarding the applicable guidelines as well.  For these reasons, the following discussion primarily addresses the

Guidelines calculations affected by the Ninth Circuit's decision and only summarizes the enhancements that the decision does not impact.[5]

**A.   Sentencing Guidelines**

    1.   <u>Summary</u>

Except as noted below, the government concurs with the offense level computation[6] in the RPSR (¶¶ 118-188) and submits that the applicable guidelines in the RPSR are correct based on all of the evidence in the record: Base offense level 7 (USSG § 2B1.1(a)(1), RPSR ¶ 125); plus 18 (loss over $3.5 million, USSG § 2B1.1(b)(1)(K), RPSR ¶¶ 126-137); plus 12 (Substantial Financial Hardship, Misrepresentation During Bankruptcy Proceeding, Sophisticated Means, Vulnerable Victim, Abuse of Position of Trust, Obstruction of Justice; USSG §§ 2B1.1(a)(1), 2B1.1(b)(1)(K), 2B.1.(b)(2)(A), 2B1.1(b)(9)(B), 2B1.1(b)(10)(C), 3A1.1(b)(1), 3B1.3, 3C1.1; RPSR ¶¶ 125-167), minus 2 for acceptance of responsibility (USSG § 3E1.1(a), RPSR ¶¶ 184-187).

    2.   <u>Uncontested Guideline Enhancements</u>

Defendant only challenged the imposition of one of the following five enhancements, namely, the misrepresentation during bankruptcy proceedings enhancement on the grounds that it involved impermissible

---

[5] The underlying offense conduct and the factual support for the Guidelines calculations were presented at the trial over which the Court presided and in the extensive briefing submitted to the Court prior to the initial sentencing hearing (<u>e.g.</u>, CR 1000, 1023, 1047), as well in the sworn affidavits in support of the criminal complaint, search warrants, and motion to revoke bail in this case. The government also concurs with the Guidelines calculations based on the tax conviction, Count 19, and the multiple count adjustment set forth in the RPSR (¶¶ 169-174, 179-182), which are unchanged from the calculations at the initial sentencing.

[6] Although the government objects and disagrees with the USPO's analysis regarding loss, particularly with regard to victim Phan, the objections do not affect the extent of the loss enhancement.

double-counting; the Ninth Circuit rejected this challenge.  (Mem. Dispo. at 8.)  Defendant did not address or challenge the other four enhancements on appeal.

> a.    *Substantial Financial Hardship (§ 2B.1.(b)(2)(A))*

For the reasons previously provided (CR 1023 at 7-9), and as the Court found (CR 1053 at 3-4), defendant caused substantial financial hardship to victims Johnson, Gardner, and Barela.  Johnson was a paraplegic and needed his settlement money to live independently and pay his living and medical expenses.  By stealing Johnson's entire settlement proceeds, defendant forced Johnson to rely on small payments from defendant (which often were only forthcoming after Johnson was reduced to begging) and SSI benefits to be able to pay his living expenses.  Because defendant stopped making the payments to Johnson and caused Johnson's SSI benefits to be cut off, defendant caused substantial financial hardship to Johnson.  Defendant also caused substantial financial hardship to Gardner, who was essentially homeless and living in her car when she retained defendant, and was homeless again about a year after defendant stole her portion of the settlement.  Finally, defendant caused substantial financial hardship to Barela when defendant stole the settlement money due to Barela thereby rendering Barela unable to pay his rent, credit card bills, and other living expenses.

> b.    *Misrepresentations During Bankruptcy Proceedings (§ 2B1.1(b)(9)(B))*

For the reasons provided prior to the initial sentencing hearing (CR 1023 at 11), and as the Court found (CR 1053 at 4-5), defendant knowingly made false representations and statements during the EA LLP bankruptcy.  These false representations, material omissions, and

fraudulent actions, designed to conceal defendant's fraud scheme and prevent his victims and others from discovering his theft of client funds, included: defendant signed under penalty of perjury the Statement of Financial Affairs and the amended Statement of Financial Affairs, in March and May 2017, respectively, and failed to include Gardner's $2,750,000 settlement payment in January 2017 (or even his fees from that settlement); defendant opened up two new bank accounts to receive Phan's September 2017 settlement money and Barela's January 2018 settlement money during the course of the bankruptcy and failed to include receipt of the funds on the respective Monthly Operating Reports ("MORs") that defendant signed under penalty of perjury; defendant testified under oath as part of EA LLP's Section 341 hearing that he only had one attorney client trust account at CBT, when in fact he had just opened a new IOLTA account at CNB a month earlier to receive a settlement in litigation involving the NFL; defendant changed the bank account from which he made his lulling payments to Johnson and Gardner and failed to disclose these liabilities or payments to Johnson or Gardner on any of his bankruptcy forms; and defendant used over $1.5 million of money he stole from Phan to pay outstanding EA LLP payroll taxes to get the EA LLP bankruptcy dismissed.

On appeal, defendant claimed this Court abused its discretion applying both this enhancement and the obstruction of justice enhancement.  The Ninth Circuit rejected this claim because the conduct on which each of these two separate enhancements was based was different -- indeed, the respective conduct arose in distinct proceedings -- and thus both enhancements were properly applied. (Mem. Dispo. at 8.)

### c.    Sophisticated Means (§ 2B1.1(b)(10)(C))

Defendant undoubtedly used sophisticated means in carrying out his fraudulent scheme for the reasons the government previously briefed (CR 1023 at 9-11), and as the Court found: "[T]here is no doubt about the complexity of the scheme here. Moreover, his deceptions of each client victim were not one-stop events: take the money and run. But rather each deception was strung out over time with multiple payments, split into multiple transfers, with ongoing misrepresentations to lull the victims." (CR 1053 at 5.)

### d.    Vulnerable Victims (§ 3A1.1(b)(1))

For the reasons the government previously provided (CR 1023 at 11-12), and as the Court found, "Johnson and Gardner clearly fall into [the vulnerable victim] category." (CR 1053 at 4.)

### e.    Abuse of Position of Trust (§ 3B1.3)

As the government established prior to the original sentencing (CR 1023 at 9-11), and as the Court found: "As a lawyer and fiduciary, Avenatti acted in a position of trust with respect to the client victims." (CR 1053 at 5.)

### 3.    Obstruction of Justice

The Ninth Circuit vacated the Court's imposition of this enhancement (CR 1053 at 6-7) solely because the Court had "failed to make explicit findings as to the elements of obstruction of justice based on perjury." (Mem. Dispo. at 2.)

The enhancement clearly applies based on the following conduct, which defendant never contested before this Court or on appeal: defendant's false and perjurious statements during a judgement-debtor examinations ("JDE") on March 15, 2019, and March 22, 2019; and

defendant's false and perjurious statements during a state bar disciplinary hearing on January 14, 2020.[7] (RPSR ¶¶ 158-167.)

Guideline Section 3C1.1 provides for a two-level enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation . . . of the instant offense of conviction." USSG § 3C1.1.  The adjustment applies to "committing . . . perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction." USSG § 3C1.1, comment. (n.4(B)).  Defendant testified under oath in several proceedings, including proceedings pertaining to the conduct that forms the basis of his offenses of conviction, and made false and perjurious statements at various JDEs and at his state bar disciplinary hearing, among other proceedings. Principally, he made false statements about his conduct in relation to Johnson, Barela, and Phan.

During his March 15, 2019, JDE, defendant testified that Johnson was paid all the money he was owed and neither defendant nor his firm had any current obligation to make payments to Johnson.  (Trial Ex. 404 at 12-14.)  During his March 22, 2019, JDE, defendant stated that the money he received into his attorney client trust account from Brock, namely, $1,600,000, did not belong to Barela; testified that

_____

[7] Section 3C1.1, Application Note 4(C), provides: "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding" is another basis to include this enhancement.  Defendant forged the signature of his law partner, Michael Eagan, on a settlement agreement to be used as part of the stipulation to dismiss the EA LLP bankruptcy proceedings.  Defendant admitted that he forged Eagan's signature on the document during a recorded phone call with Eagan. (CR 1000, Sent. Ex. 7.)  The Court can find that this fact also supports the enhancement. (RPSR ¶ 166.)

Johnson's matter with the County of Los Angeles had not been settled in its entirety; disputed that the settlement agreement was in fact the settlement agreement; claimed the settlement agreement was confidential; responded "absolutely not" when asked whether he stole Johnson's money and "absolutely false" when asked whether instead of paying Johnson his settlement money defendant had been making small payments, stating he was sure he gave Johnson a lump sum payment after the $4,000,000 came in; testified that the monies paid to Johnson over the years were "an advance on future settlement monies; and answered "absolutely false" when asked whether Phan, like Barela, had accused defendant of stealing her $4,000,000. (Trial Exs 405 8-26; 406.)   Trial Exhibits 37 and 408 show that the settlement agreement in Johnson's matter that defendant claimed was not the actual settlement agreement was, in fact, the finalized settlement agreement.   Trial Exhibits 288, 290-293 show that defendant's assertion that Phan had not accused defendant of theft was false and defendant knew it was false because defendant knew Phan had gone to the police to accuse defendant of theft in November 2018, four months earlier.

During a state bar disciplinary hearing on January 14, 2020 (after his indictment in this case), defendant: answered a question posed by the judge about whether defendant informed Barela about the $1.6M in settlement funds by stating, "Mr. Barela was fully informed of the receipt of those monies, Your Honor.  I don't recall how he was informed."; claimed he notified Barela about the $1.6 settlement money and it was Barela who was lying about not getting such a notification; claimed he provided Barela an accounting.  (CR 1000 Sent. Ex. 6.)  As demonstrated through the trial testimony and

1  evidence, and defendant's guilty plea, defendant knew he never

2  informed Barela of the receipt of Barela's settlement funds and never

3  provided an accounting to Barela.

4      These facts support the findings necessary to support the

5  obstruction of justice enhancement, which the government requests

6  that the Court make explicitly. First, the Court should find the

7  statements were false.  It is undisputed, for example, that

8  defendant's statements that Johnson had received all his funds and

9  that the $1.6 million deposited in defendant's trust account did not

10  belong to Barela were false; defendant admitted in his guilty plea

11  that he stole Johnson's and Barela's funds.  Second, defendant's lies

12  were material, that is, the statements "if believed, would tend to

13  influence or affect the issue under determination."  USSG § 3C1.1,

14  comment. (n.6).  The statements were contrary to the information

15  Johnson and Barela provided.  See United States v. Garro, 517 F.3d

16  1163, 1171 (9th Cir. 2008) (statements that contradicted documents

17  that defendant had prepared were material).  It is not necessary that

18  the testimony actually impeded the investigation. United States v.

19  Johnson, 812 F.3d 757, 763 (9th Cir. 2016).  Defendant's statements

20  were also material to an issue in the judgment-debtor examinations

21  because whether Johnson, Barela, and/or Phan were other creditors was

22  relevant to those proceedings.  Defendant's statements were also

23  material to his state bar proceeding to determine whether he violated

24  his ethical duties and his law license should be suspended. Third,

25  defendant acted with willful intent.  Defendant knowingly made the

26  false statements to avoid on-going scrutiny of his firm's financial

27  affairs, thereby further concealing his fraudulent conduct.

28

13

4.   <u>Loss</u>

The Ninth Circuit provided the following guidance regarding the calculation of loss on remand:

> The Sentencing Guidelines require sentencing courts to credit against loss the "money returned, and the fair market value of the property returned and the services rendered, by the defendant . . . to the victim before the offense was detected." U.S.S.G. § 2B1.1 cmt. n.3(E)(i). The record does not allow us to determine, as a matter of law, the fair market value of Avenatti's fees and expenses. . . . While not determinative, Avenatti's contracted fees and costs may inform the "fair market value" analysis. However, whether those contracted fees represent the fair market value of his services is a question for the district court. . . .
>
> With respect to "money returned . . . to the victim before the offense was detected," the district court abused its discretion in declining to credit (and thus deduct from the losses) the value of payments Avenatti made to Geoffrey Johnson, Alexis Gardner, and Gregory Barela after he misappropriated their settlements. <u>Id.</u> These too, should be accounted for on remand. The district court did not err in declining to credit payments Avenatti made before the misappropriation because those were not funds embezzled and subsequently "returned" to the victims.

(Mem. Dispo. at 4-5.)

To find the appropriate loss pursuant to the Ninth Circuit's directive, the Court should primarily use the calculations at the original sentencing of restitution owed, increased by the amount of the payments defendant made before the misappropriation because these were not embezzled funds defendant returned.  And because defendant's fee agreements with his victims did not include these advance payments for living expenses as costs to be deducted, they are not included in the loss calculations below for Johnson and Gardner.[8]

---

[8] The government's loss analysis has given defendant credit for the contingency fees he would have earned under his engagement agreements. Application Note 3(E)(i) to USSG § 2B1.1 governs credits against loss and provides that "loss shall be reduced by . . . the fair market value of . . . the services rendered . . . by the

*(footnote cont'd on next page)*

14

1    Even without including additional losses from relevant conduct,

2    defendant's loss figure is $8,123,000, squarely between $3.5 and $9.5

3    million, which results in a loss enhancement of 18.[9]

4                a.    *Geoffrey Johnson*

5    The USPO properly detailed the loss amount as $1,995,825 and the

6    underlying substantiation to support the loss for Johnson (RPSR ¶

7    52), which is $4,000,000 (total settlement), minus $1,600,000 (40%

8    contingency fee), minus $118,329 (EA LLP costs), minus $2,776

9    (McNicholas & McNicholas fees), minus $283,070 (post-1/29/15 payments

10   to Johnson).**[10]**

11               b.    *Alexis Gardner*

12   The USPO properly detailed the loss amount as $1,528,288 and the

13   underlying substantiation to support the loss for Gardner (RPSR ¶

14   60), which is $2,750,000 (total settlement received), minus $990,000

15   (33% contingency fee), minus $13,712 (EA LLP costs),[11] minus $218,000

16   (post-1/25/17 payments to Gardner).

17   _____

18   defendant . . . to the victim before the offense was detected."
     Defendant received his full contracted contingency fee for Phan. The
19   services defendant rendered to the other clients can be fairly said
     to have had no value given that defendant's conduct vis-à-vis his
20   clients was calculated, pervasive and severely harmful. Thus, the 18-
     level loss enhancement, which is based on loss net of contingency
21   fees, may understate the significance of this aggravating factor.

22        [9] The relevant conduct losses include approximately $807,000
     from the NFL clients whose settlement funds defendant stole and the
23   $297,500 defendant stole from Stephanie Clifford (see Mem. Dispo. at
     7), bringing the total loss to approximately $9,227,500, but even
24   this amount would not change the enhancement level, which only
     increases for losses above $9.5 million.  Moreover, even if, as
25   defendant erroneously argues, the loss for Phan were zero, the loss
     would still be at least $4,123,000.

26        [10] In March 2019, defendant acknowledged that he owed Johnson
     $1,911,381.30. (Trial Ex. 122.) He has made no payments to Johnson
27   since that date.

28        [11] Trial Exhibits 167 and 168 show additional costs incurred by
     Filippo Marchino; however, defendant never paid these costs.  As a
                                                        *(footnote cont'd on next page)*

                                      15

1

### c.  Gregory Barela

2    The USPO properly detailed the loss amount as $598,887 and the

3    underlying substantiation to support the loss for Barela (RPSR ¶ 68),

4    which is $1,600,000 (total settlement received), minus $760,000 (40%

5    contingency fee), minus $111,113 (EA LLP fees), minus $130,000 (post-

6    1/10/18 payments to Barela).

7

### d.  Michelle Phan

8    Defendant stole $4 million from Michelle Phan.  The government

9    disagrees with the USPO's determination of a lower loss amount, based

10   on information supplied by defendant, and objects to paragraphs 78-83

11   of the RPSR. Indeed, the actual evidence and testimony submitted in

12   this case show that no reduction of the $4 million loss amount is

13   appropriate; nor does the Ninth Circuit's memorandum decision provide

14   any basis for any reduction.

15   The settlement defendant negotiated for Michelle Phan was paid

16   out in two installments. Defendant took his full fee from the first

17   installment and then, when he was no longer owed anything, stole $4

18   million from the second installment.  (CR 1000 Karlous Decl. ¶¶ 19-

19   21, 1023 5-6), Nothing, other than conjecture by defendant, has

20   changed since the original sentencing to warrant a different loss

21   finding.  Phan hired defendant to represent her (and others) in

22   connection with her divestiture from Ipsy and her reacquisition of

23   her brand, EM Cosmetics.  Defendant's engagement agreement entitled

24   him to 7.5% of the recovery.

25   Defendant negotiated agreements resulting in a total payment

26   (over two tranches for three people) of $37,168,678.32.  Phan and

27

28   result, they are not included here as loss, but they are included in
     the restitution calculation.

Tran both testified that they agreed to let defendant take his <u>full</u> fee from their initial payments, even though the engagement agreement did not call for the full fee to be paid immediately.  Upon receipt of the first payments in September 2017, defendant withdrew $2,787,650.87, which was exactly -- to the penny -- 7.5% of the total payments, <u>i.e.</u>, the negotiated fee amount.  Both Phan and Tran testified that this was the entirety of what defendant was due.  Defendant cross-examined both Phan and Tran, and never once asked any questions or elicited any facts to show he was entitled to any money beyond the 7.5% of the $37,168,678.32 that he had received.[12]

Based on nothing more than a laundry-list of things of value defendant claims he provided Phan, including EM Cosmetics, and offering no evidence of any value for those things, defendant contends that Phan owes him such significant amounts of money that the $4 million he took does not represent a net loss. (CR 1200 at 10-11.) Defendant's contentions are meritless and contradicted by the evidence. The common stock repurchase agreement (Trial Ex. 268) through which the Ipsy divestiture was accomplished states that the stock shares were being purchased "in connection with" the other agreements being entered into by the parties, including Phan's reacquisition of EM Cosmetics from Ipsy.  Although there are several agreements, the various arrangements were all components of one

---

[12] During cross-examination, defendant asked office manager Judy Regnier to calculate 20% of the total amount received from Ipsy. This was, presumably, an attempt to justify the amount of money defendant took, namely the $2,787,650.87 from the first tranche and the additional $4 million from the second tranche.  Defendant provided no basis for using 20% when the fee agreement called for 7.5%, and Regnier acknowledged she would use the percentage stated in the fee agreement, <u>i.e.</u>, 7.5%, not a made-up percentage, to determine the fee amount owed.

integrated transaction for which there was a single fee, namely, the 7.5% of the IPSY shares repurchase price. The final offer sheet emailed between the parties establishes this fact. (Re-Sent. Ex. 1.) Thus, all parties, including defendant, knew that defendant's compensation for all aspects of this interconnected deal was 7.5% of the amount paid for the repurchase of the IPSY stock shares.

Furthermore, defendant's actions and communications with others demonstrate that defendant knew he stole Phan's $4 million dollars without any justification, and knew he was not entitled to any further compensation that could offset this loss. First, defendant calculated his fee based on 7.5% of all the money in both tranches, to the penny, and took it immediately (the same day) upon receipt of the settlement money from the first tranche. (Trial Ex. 369.)

Second, defendant pleaded guilty to committing wire fraud against Phan, based in part on his wiring of funds taken immediately upon his receipt of the second tranche of funds and he admitted under oath that he "misappropriated and misused" his victims' settlement funds to effectuate his wire fraud scheme. (RT 6/16/22 at 20.) Defendant's guilty plea itself establishes that he was not entitled to any additional funds upon receipt of the second tranche.

Third, when Ipsy agreed to remit the second tranche early, Tran regularly exchanged emails with defendant documenting that the full amount of the second tranche was due to Phan and Tran (approximately $8,146,288 and $147,972, respectively), i.e., no portion of the second tranche was due to defendant. Defendant never disputed that the full amount of the second tranche belonged to Phan and Tran.

Fourth, if defendant truly believed he was entitled to the money he stole from the second tranche, why would he lie to Phan and Tran

18

about it?  Upon receipt of the second tranche, defendant immediately stole $3 million of Phan's and stole more over the course of the next two months, bringing the balance in the account down from $8,294,230 to $4,100,000.  Because he had stolen the money rather than sending it to Phan and Tran as he was obligated to do, he lied to Phan and Tran about why they had not received the funds comprising the second tranche.  Defendant eventually paid Tran (over a month later) the amount Tran was due from the second tranche ($147,972), but that same day defendant lied to Phan about the money, falsely representing that he had remitted the full amounts owed to both Phan and Tran from the second tranche.  Over the course of the next two weeks, defendant continued to lie to Tran and Phan, falsely claiming to have sent Phan all of the money she was due from the second tranche ($8,146,288) and blaming the bank(s) for the supposedly "missing" money. But, of course, the money was only "missing" because defendant had already stolen well over $4 million from Phan's portion of the second tranche and had not actually wired her any money.

Even when, a couple of weeks later, defendant finally made a partial payment from the second tranche, defendant continued to lie and attempt to deceive Phan (and Tran).  First, defendant deposited approximately $46,350 back into the account, which his thefts had depleted.  This deposit enabled defendant to make two wires to Phan: one for $146,288 and a second wire for $4,000,000 wire. (Trial Ex 368.) Then, defendant falsely claimed he had sent three wires (i.e., one for $146,288; a second wire for $4 million (actually sent); and a third wire for another $4 million (the phantom wire).  For weeks, defendant continued lying to Tran, Phan, and Marchino, falsely maintaining that there were three wires (for $146,288, $4,000,000,

19

and $4,000,000), when defendant knew there was no third wire for $4 million and he had stolen that money.  Breaking the remittance into two wires ($146,288 and $4,000,000) was not necessary; its only purpose was to create a multi-wire structure that defendant could use to support his lies that there were three wires.

In sum, prior to his self-serving, newly invented assertions at sentencing, defendant never claimed to Phan, Tran, Marchino, or anyone else that he was entitled to the $4 million (or anything additional) because Phan owed him additional money beyond the 7.5% fee he had already fully taken.  The reason is clear from the evidence: Phan did not owe defendant anything additional.

To date -- almost seven years after stealing Phan's money -- defendant has not provided a single document or pointed to a single fact that would justify his taking the $4 million above his negotiated 7.5% fee from Phan.  Defendant delayed the sentencing for months, including harassing victims and forcing them to spend yet more time and money to quash improper subpoenas defendant issued in an attempt to obtain an expert opinion regarding the value of EM Cosmetics.  In the end, defendant's expert could not provide any opinion and, tellingly, defendant no longer is seeking an evidentiary hearing, presumably because he has no evidence that would support his position.[13]  Moreover, to the extent the Ninth Circuit instructed the

---

[13] The USPO acknowledges that defendant's expert reported that "there was insufficient information to estimate the fair market value of Em Cosmetics using accepted valuation approaches." (RPSR ¶ 80.) Nonetheless, the USPO then quotes share prices and fair market values the expert "derived" from the stock transaction, and his conclusion that "Phan realized a benefit of $22,271,179" from the share repurchase transaction. (RPSR ¶ 83.) Even if this analysis is accepted, and even if -- the agreements to the contrary notwithstanding -- this share repurchase amount should be included in
*(footnote cont'd on next page)*

20

1  Court to determine what, if any value Phan received by acquiring EM

2  cosmetics, it did so only for purposes of determining the correct

3  amount of restitution to be ordered. (Mem. Dispo. at 5-6.)

4     In sum, the Court can and should reject defendant's baseless

5  claims that Phan owed him anything and find that the loss resulting

6  from the offense against Phan is $4,000,000.

7        5.   Restitution

8     The restitution amounts that the Court found at the original

9  sentencing hearing largely remain accurate, except new information

10 shows that several third parties have made payments to the victims to

11 address their losses.  Therefore, the Court should order full

12 restitution for the losses defendant caused his victims, and order

13 restitution be paid to the victims first with the third-parties

14 receiving restitution after the victims are paid.  18 U.S.C.

15 §§ 3664(f)(1)(B), (j)(1); United States v. Rizk, 660 F.3d 1125, 1136-

16 37 (9th Cir. 2011).  The government agrees with the restitution

17 amounts calculated for the tax count, which remain the same as before

18 (RPSR ¶ 339), agrees with the restitution amounts for the fraud

19 counts (RPSR ¶ 340), except for the amount the USPO calculated as

20 owed to victim Phan.  The only challenge defendant made to the

21 restitution on appeal pertained to the amount owed to Phan based on

22 the claim that the value of EM cosmetics that Phan received should

23 reduce the amount of restitution defendant owes to Phan.  As

24 explained above, however, defendant has failed to produce any

25 evidence to support a reduction in the restitution on this basis.

26

27

28

the amount of which defendant is entitled to 7.5% as a fee, the $4
million defendant stole should only be reduced by $1,670,338 (i.e.,
$22,271,178 x .075), leaving an actual loss sustained by Phan of
$2,329,661. Even with this reduction (which the government disputes),
the loss enhancement remains 18 levels.

The Court should order total restitution to the victims as follows: (1) Johnson – $1,571,092, with $899,342 to be paid to Johnson and thereafter, $671,750 paid to Michael Eagan and $5,500 to Judy Regnier; (2) Gardner – $1,432,585, with $1,332,585 to be paid to Gardner and thereafter, $100,000 paid to State Bar of California Client Security Fund; (3) Barela – $598,887, with $459,887 to be paid to Barela and thereafter, $100,000 paid to State Bar of California Client Security Fund, $24,000 paid to Arden, and $15,000 paid to Ibrahim; and (4) Phan -- $4,000,000, with $2,391,577.70 to be paid to Phan and thereafter, $100,000 paid to State Bar of California Client Security Fund and $1,508,422.30 paid to the IRS.

## B.    Criminal History

The original PSR determined that defendant had 6 criminal history points, placing him in Category III.  Three of those points were based on the conviction in the Clifford Case.  Those three points can no longer be assessed because the Ninth Circuit has held that the Clifford Case is relevant conduct to the instant offenses. See U.S.S.G. ¶ 4A1.2(a)(1) & comment. (n.1); United States v. Cruz-Gramajo, 570 F.3d 1162, 1167 (9th Cir. 2009).  When those three points are subtracted, three criminal history points remain, placing defendant in Category II.

The Sentencing Commission recognizes that where "reliable information indicates that the defendant's criminal history category substantially underrepresents the seriousness of the defendant's criminal history of the likelihood that the defendant will commit other crimes, an upward departure may be warranted."  USSG § 4A1.3(a)(1). Here, defendant's three criminal history points do not reflect the seriousness of his criminal history.  These three points

are all attributable to his convictions for attempting to extort Nike
for $22.5 million in March 2019. (RPSR § 201.) His criminal history
score does not include any points for: (1) his criminal violations
that led to the Court revoking his bail; (2) the numerous failure-to-
file and failure-to-pay tax offenses defendant committed beginning in
2011 in connection with own Forms 1040 as well as, beginning in or
about 2015, the Forms 941 filed for his entities EA LLP, A&A, and
Global Baristas US LLC ("GBUS") (RPSR §§ 91-98); (3) the $807,773
embezzlement from 200 clients who had brought a class action against
the NFL, which defendant committed beginning in May 2017 (RPSR
§§ 190-191); and (4) the $148,750 embezzlement from client Stephanie
Clifford, which defendant committed from February 2018 through
February 2019 (RPSR §§ 84-90).

Defendant's Criminal History Score of three also substantially
underrepresents his likelihood of recidivism, given his grudging (at
best) admission of what he did wrong in the instant case, and his
lack of remorse for his victims, as reflected in his efforts to
prevent his victims from recovering any of the monies he stole from
them from third parties. (Re-Sent. Ex. 7; CR 1088.)  The seriousness
of defendant's criminal history and the risk of recidivism he poses
are also relevant to this Court's consideration of the § 3553(a)
factors, as discussed below.

**III. A SENTENCE OF 208 MONTHS REDUCED BY 40 MONTHS FOR THE PORTION OF
THE CLIFFORD CASE SENTENCE ALREADY SERVED IS REASONABLE AND
APPROPRIATE BASED ON THE 3553(A) FACTORS**

**A.    Overview**

Defendant's criminal conduct arose from calculated choices that
resulted in multiple blatant and egregious violations of the trust
placed in him by his clients over the course of many years.

Defendant was not driven to commit his crimes by need, desperation, or the inability to legitimately earn a living.  Despite the significant advantages defendant enjoyed -- including a first-rate education and a thriving professional career -- defendant chose to commit numerous, deplorable crimes harming vulnerable victims over a lengthy period of time.

The advisory Sentencing Guidelines are the starting point for sentencing.  Gall v. United States, 552 U.S. 38, 49 & n.6 (2007). With an advisory range of 188-235 months' imprisonment, and based on the numerous aggravating circumstances present here, a sentence of 208 months, reduced by the 40 months defendant has served on the Clifford Case, is appropriate, just, and not greater than necessary to achieve the goals of sentencing.  Because the aggravating factors far outweigh any mitigating factors, the circumstances of defendant's case do not support an exercise of leniency.

**B.    Nature and Circumstances of the Offenses (§ 3553(a)(1))**

Defendant's crimes were exceedingly serious.  Defendant inflicted tremendous harm on his wire fraud victims, who testified about those harms at trial and have submitted victim impact statements ("VIS") that further describe the financial and emotional harms defendant caused.  The emotional damage was particularly acute because defendant stole from clients who had turned to him for help addressing harms they had already suffered and had put their trust in him and relied on him to represent their interests.  Rather than honor his obligations and fulfill his duties -- legal, professional, and ethical -- defendant stole from his legal clients, lied to them for months and years, forged and fabricated documents, testified falsely under oath, and went to great lengths to conceal his fraud.

24

1  And when defendant's victims attempted to confront defendant and hold

2  him accountable his criminal conduct, defendant attacked and defamed

3  his victims -- oftentimes with private information defendant only

4  knew from his legal representation of the victims.

5      Johnson described defendant's conduct and its impact:

6      To this day, I do not know why Michael lied and deceived
       me, why he broke my trust, why he broke my heart. I trusted
7      him implicitly, I believed the things he told me, but it
       was all part of his plan to defraud me of my settlement. To
8      this day, I have a hard time trusting people because of
       what Michael did, and I live in constant fear of being
9      taken advantage of again, particularly given my physical
       disability.

10

11  (Johnson VIS ¶ 23.)  Gardner explained the effects defendant's

12  actions have had on her:

13      It creates resentment, a wave of bitter anger at having
        been mistreated. I have lost job opportunities, personal
14      relationships, and friendships where I have pushed people
        away in fear of being taken advantage of. I am constantly
15      plagued by my wounds, as my heart truly hurts. I have felt
        pain writing this. To elaborate on these moments causes me
16      chest pain, jitters, a throbbing migraine, sweat, blurred
        vision, and my throat becomes so tight I can barely speak.

17  (Gardner VIS at 6.) Barela described his pain:

18

19      [A]s the months go by and with an even further pit in the
        stomach, you must now face the truth that, yes, you have
20      been swindled, not once, but twice, and the second time by
        the very person who swore to help.  Not only is there the
21      realization that the money that you needed to keep your
        family and your business afloat is not coming to you, you
22      realize the man you have admired and even felt a friendship
        towards, has, without any apparent regard for your well-
23      being, cheated you, lied to you repeatedly, and is still
        trying to convince you otherwise."

24  (Barela VIS at 1.)

25      Johnson and Gardner also spoke at defendant's original

26  sentencing, further describing the harm defendant inflicted on them.

27  Johnson recounted how defendant insulted and abused him when

28  defendant cross-examined Johnson at trial.  Johnson explained the

25

real, lifelong consequences of defendant's criminal conduct, including Johnson's reluctance to trust anyone again, his recurring fear that people will take advantage of him due to his disability, and his inability to sleep without having nightmares.  Gardner detailed her anxiety, grief and nightmares, and her fear that she is unsafe and being stalked, all as a result of being victimized by a person she chose to trust.  The impact on Gardner was so great that she fears kindness from people because she does not know if any kindness she receives is real.  (Re-Sent. Ex. 2.)

Although defendant's criminal conduct occurred more than five years ago, that fact does not diminish the scope and sheer evil of defendant's crimes.  In 2011, Johnson was rendered a paraplegic and retained defendant.  Defendant finally resolved Johnson's claims in 2015, but instead of caring for and giving the settlement funds to his client, who desperately needed the money to pay for his living and medical expenses, defendant lied to Johnson and concealed both the settlement and payment of funds from him.  Defendant continued lying to Johnson for four additional years, making small lulling payments along the way, at the same time preventing Johnson from getting a handicap-accessible home and van and causing Johnson to lose his SSI benefits.  After the charges in this case were filed, and Johnson brought a civil suit against defendant for his theft of Johnson's money, defendant attacked Johnson's character, calling him disturbed (among other things), and posted online documents defendant obtained through further deceit to undermine Johnson.

Gardner was homeless when she met defendant in December 2016, and defendant quickly negotiated a settlement in her matter. Defendant again immediately began lying about the settlement terms

1    and the settlement payment and purchased a private jet with Gardner's

2    money.  Defendant continued lying to Gardner for years, making

3    periodic lulling payments and blaming the purported non-payment of

4    the agreed upon settlement on her ex-boyfriend, which caused Gardner

5    further emotional distress.  Thanks to defendant, Gardner was without

6    a residence within a year of the settlement.  After the charges in

7    this case were filed, defendant attempted to harass and intimidate

8    Gardner and her ex-boyfriend, stating he looked forward to the

9    underlying facts coming to light—facts that, as defendant knew, were

10   part of a confidential agreement and only known to defendant through

11   his representation of Gardner.

12         Barela retained defendant in 2014 to represent him in his case

13   against a company that stole his business idea. Defendant obtained

14   the settlement with the company in December 2017.  Not only did

15   defendant lie to Barela about the settlement terms and settlement

16   payment, defendant created bogus documents to conceal his theft of

17   Barela's settlement, lied to Barela regularly, made small payments to

18   Barela to lull him, and provided false excuses as to why Barela could

19   not do anything about the missing money.  When Barela had the

20   audacity to hire counsel to accuse defendant of doing exactly what

21   defendant had, in fact, actually done, and seek to recover Barela's

22   money, defendant publicly -- and ruthlessly -- attacked Barela's

23   character citing information that, again, defendant only knew because

24   of his legal representation of Barela.

25         Phan hired defendant to assist her in resolving a stressful

26   business situation. Defendant turned the situation into an

27   opportunity to steal $4 million from Phan, causing her additional

28   emotional stress and anxiety.  Defendant lied to Phan and her

business manager about the stolen money, even concocting a convoluted

story about multiple wires, one of which supposedly went missing

(there never was a missing wire), to deflect blame and scrutiny from

himself onto the bank.

Defendant admitted a bare minimum of facts to support his guilty

pleas and issued a generic apology letter to all four victims.

During his allocution at his original sentencing, defendant claimed:

> I'm deeply sorry and remorseful for my criminal conduct. I
> caused harm and damage to four individuals who relied on me,
> needed me, and who were not only my clients but my friends. I
> cared about them, helped them, and fiercely advocated for
> them, and yet inexplicably I later took from them.

(RT 12/5/22 at 78.)  Defendant's bare bones apology was not even

truthful.  He did not "fiercely advocate for his clients" and steal

from them "later"; to the contrary, he lied to Johnson, Gardner, and

Barela before the settlement proceeds even hit his account.

Moreover, as the evidence at trial demonstrated, defendant's efforts

to settle his clients' claims were really efforts to bring in money

that he could steal.  Defendant told the judge presiding over

Johnson's case that the settlement money had to be paid immediately

because of Johnson's needs, but then defendant took the money for

himself.  Defendant left countless messages with counsel for

Gardner's ex-boyfriend trying to get the money immediately, but—

again—took the money for himself.  And persuading Brock's counsel to

pay Barela's settlement money even before it was due, defendant again

simply took the money.  In sum, defendant used his clients as pawns

to line his pockets, live his lifestyle, and buy a jet.

The Guidelines account for some of these aggravating factors,

but do not capture many other aggravating aspects of defendant's

criminal conduct.  First, defendant's wire fraud scheme entailed

other crimes, including: identity theft, involving defendant's
forging Johnson's name on loan documentation for Johnson's attempted
home purchase in 2017 (CR 1000 at 25); and making false statements
under penalty of perjury in civil proceedings, including in EA LLP's
bankruptcy and JDEs (Section II.A.2.b, II.A.3, above), which
defendant did to conceal his thefts.  Second, defendant's wire fraud
scheme harmed more than the four victims underlying the counts of
conviction. Defendant also stole settlement money from other clients,
including nearly $300,000 from Stephanie Clifford (RPSR ¶¶ 84-90),
over $800,000 from nearly 200 clients he represented in connection
with Greco v. NFL, and Amélia Racine, from whom he stole $15,000
(Sent. Ex. 21). Defendant's criminal conduct also caused harm to more
than just the proximate victims of his scheme, wreaking havoc in the
lives and affairs of many third parties who have had to pay for
defendant's criminal conduct.  Both EA LLP and GBUS were placed into
bankruptcy due to defendant's actions, and countless creditors are
owed millions of dollars that they will almost certainly never
recover.  In addition, the parties to some of the underlying civil
cases that resulted in the settlements that defendant stole, resolved
their matters through confidential agreements; those parties lost the
finality and privacy protections of those agreements and needed to
expend more resources in connection with defendant's criminal case.

    Third, the guidelines do not fully capture all of defendant's
reprehensible conduct and the harm it inflicted.  Defendant's offense
level would be the same if he had simply lied to his clients about
their settlement agreements and payments, and then just stolen their
money.  But defendant did far more than that, he: prevented Johnson
from buying a handicap-accessible home; caused Johnson to lose his

SSI benefits; lied to Johnson and provided him with yet more bogus documentation in March 2019; caused Gardner to suffer additional emotional harm by making her believe her ex-boyfriend was continuing to mistreat her; and violated his duty of loyalty to his clients by publicly attacking them. Finally, the Guidelines do not capture the harms caused by defendant's tax crime, since no multi-count adjustment applies.  But the tax crime is also extremely serious, resulting in over $3.2 million in federal payroll taxes not being paid. (RPSR ¶ 114.) This crime, too, caused harm not just to the immediate victim the U.S. Treasury -- but also to the hundreds of GBUS employees whose tax accounts were affected.  (RPSR ¶¶ 95, 101(e).) In sum, defendant's crimes were exceedingly serious and caused widespread harm, which require a significant term of imprisonment.

**C.    History and Characteristics of Defendant (§ 3553(a)(1))**[14]

Defendant's history and characteristics present further aggravating factors that justify a significant custodial sentence. Defendant's education and work history show that he had every opportunity to live a prosperous, law-abiding life running a legitimate and lucrative law practice.[15]  Instead, defendant stole

---

[14] The arguments and analysis in the government's previous sentencing memoranda regarding "Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, provide Just Punishment, Afford Deterrence, and Protect the Public from Further Crimes of the Defendant (§ 3553(a)(2))" and "Need to Avoid Unwarranted Sentencing Disparities (§ 3553(a)(6))" remain the same and the government will not repeat them here, but the Court should consider those arguments in support of the government's sentencing recommendation.  (CR 1000 at 35-41, 1024 at 14-15.)

[15] During an under-oath deposition last year, on February 29, 2024, defendant listed several cases he resolved successfully in 2014 and stated that the firm, EA LLP, was firing on all cylinders in 2014-2017 and the future was incredibly bright.  (Re-Sent. Ex. 5 at
*(footnote cont'd on next page)*

30

1    millions of dollars from his clients and used his superior knowledge

2    of the legal system to conceal his thefts.

3         That defendant consistently puts his own interests and desires

4    ahead of the interests and needs of others and will say and do

5    anything -- legal and/or truthful or not -- that he believes will

6    benefit himself is also demonstrated by the conduct underlying

7    defendant's violations of his bail conditions and his convictions in

8    the Nike and Clifford Cases, in which defendant violated his duties

9    as a lawyer by lying to and betraying his clients for his own

10   personal benefit.  The government's initial sentencing brief detailed

11   defendant's abusive cross-examinations at the trial in this case[16] and

12   his attempts to threaten and bully others, including the victims in

13   this case and others not involved in this case.

14        Defendant has proven after each of his sentencing hearings that

15   his purported contrition was feigned.  In his generic "apology"

16   letter to the four victims in this case, defendant stated: "I am

17   committed to righting my moral compass and ensuring that you fully

18   recover all monies you are due as a result of my illegal actions. I

19   promise to work tirelessly to ensure this occurs." (RPSR ¶ 117.)

20   During his allocution, defendant asked this Court "in imposing your

21

22   _____
     188-192.) Those facts, if true, make defendant's theft of his
23   clients' funds during those years more egregious; if false, defendant
     has demonstrated once again his inability to be truthful and comply
24   with the law, even after his sentencing in this matter.

25        [16] Defendant provided the following allocution at the Nike
     sentencing: "I am deeply humbled before you here today. Despite the
26   deep shame and remorse, I still feel positive because I know that I
     can do better, that I can be the person I dreamed of being when I was
27   a child. I look forward to working hard to become the person I once
     was, and I will, if given the chance."  (19-CR-373-PGG, RT 7/8/21 at
28   29.)  Defendant's cross-examinations of his victims in this case
     several weeks later demonstrated that his purported contrition was
     simply an attempt to garner a benefit for himself at sentencing.

31

sentence, you provide me with another chance . . . to do good for others, . . . and do right by the people I have harmed, including Mr. Johnson and Ms. Gardner." (RT 12/5/22 at 79.) On the same day as defendant's sentencing hearing, using the court-appointed paralegal in this case, defendant filed objections with the State Bar of California trying to prevent his victims from recovering from the Bar's Client Security Fund ("CSF") -- money that would have no impact whatsoever on defendant and would cost him nothing, but defendant objected nonetheless. (Re-Sent. Ex. 7.)[17] Due to defendant's conduct in this and other matters, the California Bar has paid out $359,000 from the CSF to victim-clients of defendant. (Re-Sent. Ex. 8.)

In sum, contrary to his oft-repeated claim of fighting for the little guy, defendant only fights for himself, often at the expense of the little guy.

### D. Post-Conviction Conduct By Defendant

Contrary to the Probation Officer's claim (Sent. Rec at 9-10) defendant's conduct while incarcerated does not justify a reduction in his sentence. As was the case prior to his original sentencing, since December 2022, defendant has continued to make false statements (including under oath), blame everyone but himself for the consequences of his actions, and make baseless accusations against others. Defendant voluntarily testified under oath on at least four days in the EA LLP bankruptcy and related adversary proceedings. (Re-

---

[17] Defendant similarly objected to the IRS returning money to Phan that defendant stole to pay the IRS, even though it again had no financial impact on him. (CR 1088, 1089.) Defendant also apologized for his conduct and actions at his sentencing in the Clifford Case, but has since taken to social media and other outlets to defame and disparage Ms. Clifford. (1:19-cr-374-JMF (SDNY), Dkt 433-8; Re-Sent. Ex. 9.)

Sent. Exs. 3-6.)  Defendant used the opportunities to baselessly accuse countless people of criminal and unethical behavior while simultaneously providing false testimony.[18]  As one example, in response to questions about artwork purchased with EA LLP funds and defendant's criticism of the Trustee's counsel's legal positions, the Trustee's counsel stated, "Well, you put [EA LLP] into receivership, Mr. Avenatti, not me."  Defendant responded: "No, I didn't put it into receivership. . . .  No, that's not true, sir. I didn't put it into receivership." (Re-Sent. Ex. 6 at (internal pages) 335-36.) Contrary to his under-oath statements, defendant in his individual capacity and on behalf of EA LLP stipulated to the appointment of a receiver in February 2019.  (Re-Sent. Ex. 11.)

Even though defendant pleaded guilty in this case to knowingly defrauding his clients of millions of dollars over numerous years and to committing a large-scale tax fraud, defendant continued to make baseless accusations against others, including the prosecutors, who he blamed for his current situation, including: accusing Fillipo Marchino of committing perjury at defendant's trial at the urging of the USAO (Re-Sent. Ex. 3 at 19-20, 37); claiming Jason Frank and Andrew Stolper engaged in misconduct with the government with "significant Brady issues and other misconduct by all of those parties in connection with my criminal convictions" (id. at 27); accusing the Trustee and the USAO of conspiring together to obtain favorable testimony from a witness and claiming the USAO committed a

---

[18] During defendant's depositions, defendant accused the Bankruptcy Trustee, at least two separate counsel for the Trustee, members of the USAO, four former law partners, the receiver, a lawyer who served as co-counsel, and an LATimes reporter of acting in criminal, unethical, and/or dishonest manners.  (Re-Sent. Exs. 3-6.)

1   "blatant Brady violation" (Id. at 38-39).

2       In August 2024, defendant submitted a letter to the Court and

3   the government claiming he wanted to bring to everyone's attention a

4   $19 million verdict that Passport 420, LLC, had received and

5   asserting that defendant "may be entitled to approximately $9.5

6   million of this amount through A&A's ownership stake in Passport

7   420." (Re-Sent. Ex. 11)[19]  As defendant knows, however, he stipulated

8   to turn over his entire interest in Passport 420, held by A&A, to his

9   second wife as part of his divorce (Re-Sent. Ex. 13) and he testified

10  to this under oath in March 2019 (Re-Sent. Ex. 15).

11      **E.    The USPO's Sentencing Recommendation Is Factually and
              Legally Flawed**

12

13      The government disagrees with the Probation Officer's

14  recommended sentence, which would represent a 73% reduction below

15  even the low end of the Guidelines range (188 to 235 months), which

16  the Probation Officer herself found applies.  The Probation Officer

17  has offered virtually no basis for this extraordinary reduction.  In

18  support, she offers only that defendant completed college and law

19  school despite an unstable and abusive childhood, had a stable work

20  history before committing the instant offenses, is a devoted father,

21  and has demonstrated post-offense rehabilitation while in prison.

22  Even if all true, nothing about these facts distinguishes defendant

23  from many other people, let alone justifies the massive variance the

24  Probation Officer has recommended.  Indeed, the Probation Officer has

25  not made any attempt to balance her make-weight reasons against the

26

27      [19] Similarly, in February 2025 defendant, as the "Manager" of
    Passport 420, sent a demand to the attorneys representing Passport
28  420 that defendant is terminating them and they must cease
    representing the company.  (Re-Sent. Ex. 12.)

egregious aggravating factors that she herself acknowledges are present here.  The Probation Officer also cited the difficult circumstances defendant endured while serving a custodial term in New York as a basis for a variance, and the Court has previously recognized this factor as grounds for a downward variance.  But now, other factors suggest that such a variance should be adjusted to account for (1) defendant's recalculated Criminal History score, resulting in a Criminal History Category that understates the seriousness of defendant's criminal past and the risk of recidivism he poses (see II.B., above), and (2) a loss enhancement that gives defendant credit for contingency fees that, in fact, had no fair market value because no client would pay a lawyer to steal the client's settlement money (see II.A.4., above).

**IV.   CONCLUSION**

For the foregoing reasons, the government recommends that the Court (a) sentence defendant to 208 months in prison (the middle of the applicable guidelines range), on each of counts 5, 8, 9 and 10, to run concurrently to one another; (b) adjust the term to account for the portion of the Clifford Case sentence that defendant has already served (40 months); (c) sentence defendant to 36 months on count 19, to run concurrently with the sentences imposed on counts 5, 8, 9 and 10; and (d) impose all sentences to be concurrent to the portion of the sentence imposed in the Clifford Case that remains to be served (8 months); (e) include a three-year period of supervised release, a mandatory special assessment of $500; and (f) order restitution in the amount of $7,602,564 due to the wire fraud victims and $3,207,144 to the IRS as a condition of supervised release.