1  CUAUHTEMOC ORTEGA (Bar No. 257443)
   Federal Public Defender
2  ADITHYA MANI (Bar No. 301880)
   (E-Mail: Adithya_Mani@fd.org)
3  Deputy Federal Public Defender
   411 West Fourth Street, Suite 7110
4  Santa Ana, CA  92701
   Telephone: (714) 338-4500
5  Facsimile: (714) 338-4520

6  MARGARET A. FARRAND (Bar No. 235295)
   (E-Mail:  Margaret_Farrand@fd.org)
7  Deputy Federal Public Defender
   321 East 2nd Street
8  Los Angeles, California 90012-4202
   Telephone:  (213) 894-2854
9  Facsimile:  (213) 894-0081

10 Attorneys for Defendant
   MICHAEL J. AVENATTI

11

12

13              **UNITED STATES DISTRICT COURT**

14            **CENTRAL DISTRICT OF CALIFORNIA**

15                   **SOUTHERN DIVISION**

16

17 UNITED STATES OF AMERICA,            Case No. 8:19-cr-61-JVS

18            Plaintiff,

19       v.                             **DEFENDANT'S RESPONSE TO
                                        GOVERNMENT'S SENTENCING
                                        MEMORANDUM**
20 MICHAEL J. AVENATTI,

21            Defendant.

22

23

24

25

26

27

28

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....................................................................................................1

II. THE GOVERNMENT'S DISPARAGEMENT OF THE PROBATION
OFFICE'S RECOMMENDATION IS UNWARRANTED ....................................2

III. THE GOVERNMENT VASTLY OVERREACHES BY FOCUSING ON
UNRELATED CONDUCT AND UNSUBSTANTIATED CLAIMS .....................4

    A.      Erroneous Claim that Mr. Avenatti's Criminal History is Understated ......4

    B.      Erroneous Miscasting of Good-Faith Litigation as Misconduct.................8

    C.      Unsupported Claim that Mr. Avenatti Made "Baseless Allegations" .........9

IV. THE GOVERNMENT'S LOSS ARGUMENTS ARE ERRONEOUS...................11

V. THE OBSTRUCTION OF JUSTICE ENHANCEMENT IS INVALID.................11

VI. CONCLUSION ..................................................................................................12

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*United States v. Anderson*,
   741 F.3d 938 (9th Cir. 2013) ................................................................................8

*United States v. Avenatti*,
   2024 WL 4553810 (9th Cir. Oct. 23, 2024) ........................................................11

*United States v. Bad Marriage*,
   392 F.3d 1103 (9th Cir. 2004) ..............................................................................5

*United States v. Carrillo-Alvarez*,
   3 F.3d 316 (9th Cir. 1993) ....................................................................................5

*In re Eagan Avenatti*,
   659 B.R. 214 (C.D. Cal. May 7, 2024) ........................................................6, 9, 10

*United States v. Franklin*,
   18 F.4th 1105 (9th Cir. 2021) .............................................................................6, 7

*United States v. Hanna*,
   49 F.3d 572 (9th Cir. 1995) ...................................................................................7

*United States v. Huckins*,
   53 F.3d 276 (9th Cir. 1995) ...................................................................................7

*United States v. Kerr*,
   876 F.2d 1440 (9th Cir. 1989) ...............................................................................7

*Lagos v. United States*,
   584 U.S. 577 (2018) .............................................................................................11

*United States v. McGowan*,
   668 F.3d 601 (9th Cir. 2012) .............................................................................6, 7

*United States v. Pepper*,
   562 U.S. 476 (2011) ...........................................................................................2, 4

*United States v. Petty*,
   982 F.2d 1365 (9th Cir. 1993) ...............................................................................6

*United States v. Pham*,
   545 F.3d 712 (9th Cir. 2008) ...........................................................................8, 11

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*United States v. Ponce*,
   51 F.3d 820 (9th Cir. 1995) .................................................................................7

*Rosales-Mireles v. United States*,
   585 U.S. 129 (2018)..........................................................................................1

*United States v. Trujillo*,
   713 F.3d 1003 (9th Cir. 2013) ...........................................................................4

**Federal Statutes and Guidelines Provisions**

18 U.S.C.§ 3664.......................................................................................................11

U.S.S.G. § 4A1.3 ...............................................................................................5, 6

U.S.S.G. § 6A1.3 ..................................................................................................6

## I. INTRODUCTION

The government asks this Court to increase Mr. Avenatti's sentence from 168 to 208 months[1] after his successful appeal *lowered* his Guidelines range. That approach would completely erase the 4-level downward variance this Court applied at his prior 2022 sentencing, without giving any consideration to either Mr. Avenatti's positive pre-2022 conduct or his significant post-sentencing rehabilitation. Nothing justifies this draconian result. To not only not decrease, but *increase* Mr. Avenatti's sentence absent any intervening misconduct would improperly punish him for his successful appeal, in which the Ninth Circuit recognized that his original 262-327-month Guidelines range was far too high. The Ninth Circuit's decision calls for a significantly decreased sentence—not punishing Mr. Avenatti with *more* prison time.[2]

In urging an increased sentence, the government also vastly overreaches. It wrongly attempts to characterize good-faith litigation by Mr. Avenatti's *counsel* as somehow constituting misconduct by Mr. Avenatti *himself*—even going so far as to criticize Mr. Avenatti for his counsel's meritorious motion to stay the restitution award pending appeal (Dkt. 1088)—a position with which this Court ultimately agreed when it denied the government's motion to immediately disburse restitution funds. (Dkt. 1092.) It also continues its unwarranted attacks on defense counsel (*see* Dkt. 1185), accusing them of "harassing" Ms. Phan simply by serving a subpoena for relevant

---

[1] The government's requested 208-month increased sentence would amount to an aggregate of 238 months—*almost 20 years*—when combined with his 30-month sentence sentence on the *Nike* case.  To avoid any doubt, the 40 month deduction that the government agrees the Court should credit for time already served in the *Clifford* case, to arrive at a final recommended sentence of 168 months, is not a gift Mr. Avenatti is receiving—it is credit for time he has actually served in prison and is required by the Guidelines, as the Revised PSR explains (PSR ¶ 325.)

[2] This Court should also reject the government's outcome-oriented approach to the Guidelines calculation—which molds the Guideline range to arrive at the same sentence Mr. Avenatti originally received. Rather than starting at a target sentence and then manipulating the Guidelines to allow for it, as the government's calculation does, this Court must use the correct Guidelines range as the starting point for its analysis. *Rosales-Mireles v. United States*, 585 U.S. 129, 145 (2018) ("The Guidelines are 'the starting point for every sentencing calculation in the federal system.'") (cleaned up).

1

1   information. And it attempts to cast Mr. Avenatti's claims of *Brady* violations and

2   misconduct as supposedly "baseless" without even attempting to show those allegations

3   are false—and when, in fact, other parties have made similar allegations in public

4   filings.

5          Finally, it is unreasonable for the government to urge this Court to ignore

6   wholesale Mr. Avenatti's substantial public service work, contributions to the legal

7   profession, and close family relationships, after this Court previously balanced these

8   mitigating factors with the aggravating facts of this case in applying a four-level

9   downward variance. The government also completely discounts Mr. Avenatti's

10  exemplary post-sentencing rehabilitation, a matter at the core of Section 3553's

11  analysis (*see United States v. Pepper*, 562 U.S. 476 (2011)) and something the

12  Probation Office, an unbiased arm of the Court, believes merits a three-level downward

13  variance on its own.

14         The Probation Office correctly and appropriately took the undisputed facts into

15  account in recommending an aggregate six-level downward variance: Mr. Avenatti *did*

16  put his safety at risk and donate his own funds to help apprehend a notorious sexual

17  predator, *did* handle high-stakes public interest cases and secure landmark verdicts, and

18  *did* return children in immigration facilities to their parents. He remains a loving father,

19  committed friend, and trusted inmate within the BOP, with a "minimal" assessed

20  recidivism score through his entire prison term. (Ex. I at 4 (noting "minimum"

21  recidivism pattern "during the entirety of his incarceration")). He has worked in prison

22  as a Suicide Watch Companion, assisted inmates with reentry, completed rehabilitative

23  programming, and maintained a spotless disciplinary record. As the Probation Office

24  rightly recognized, this information must be impartially weighed and considered.

25  **II.  THE GOVERNMENT'S DISPARAGEMENT OF THE PROBATION**
**OFFICE'S RECOMMENDATION IS UNWARRANTED**

26

27         The government unfairly disparages the Probation Office, claiming "[t]he

28  Probation Officer has offered virtually no basis" for its recommendations and undercuts

2

the Probation Office's careful explanations for the recommendation of a six-level

variance from the calculated 188-235-month range as "make-weight reasons." (Dkt.

1214 at 34.) The government tries to entirely negate Mr. Avenatti's substantial

evidence of pre- and post- sentencing rehabilitation—giving it no weight—even as it

assumes it is "all true." (*Id.*) But the Probation Office correctly and carefully

considered this significant evidence, including that Mr. Avenatti:

- has undergone extensive rehabilitation in prison, volunteering and being selected
  as a Suicide Watch Companion entrusted with inmates' safety, helping inmates
  prepare to take the GED and reenter society (Exs. H, K);

- has completed extensive programming in custody, including the RDAP program,
  and maintained a "minimal" recidivism score (Exs. I, K);

- has been recognized as a "model inmate" with "an unblemished disciplinary
  report," who has demonstrated "exceptional character, growth, and capacity for
  change over the last three years," has "shown considerable humility and patience,
  often under difficult circumstances," and "has consistently demonstrated remorse
  and accountability for his crimes" (Ex. K at 4; *see also* Ex. J);

- completed college and put himself through law school by attending night school,
  working full time while other students did not have to do so, and rising to the top
  of his class despite both his additional work obligations and an unstable and
  abusive childhood (*see* PSR ¶¶ 209-13, 267; Dkt. 1198 at 10);

- had a stable work history before the instant offense (Dkt. 1198 at 10);

- "is a devoted father" who has consistently shown concern for his daughters and
  maintained close relationships with family and friends despite his incarceration
  (Dkt. 1198 at 10; PSR ¶¶ 230, 237; Ex. U at 1-3);

- handled high-stakes cases in his legal career that advanced the public interest,
  including by $454 million jury verdict against the Kimberly Clark Corporation
  for sale of defective personal protective equipment in 2017, an $80 million
  settlement on behalf of Jewish families for desecration of their deceased

3

relatives' remains in 2014, and recognition as Trial Lawyer of the Year (2009),

by the California Assembly for commitment to legal ethics and preservation of

the justice system, and the National Public Justice Trial Lawyer of the Year

award in 2018 (Dkt 1211 at 5-6; Dkt. 1016, 1016-1); and

- performed significant pro bono work, including reuniting deported parents with
  their children held in immigration custody (Dkt. 1016, 1016-1, Ex. U at 19-23).

The Probation Office was legally right to consider this evidence in such a

measured way; the government defies the law, and logic, by dismissing it. The Supreme

Court has repeatedly held that post-sentencing rehabilitation is not only relevant, but a

critical factor sentencing courts must weigh. *United States v. Trujillo*, 713 F.3d 1003,

1010 (9th Cir. 2013) ("In *Pepper* and *Gall*, the Supreme Court made clear that post-

sentencing or post-offense rehabilitation—particularly in light of its tendency to reveal

a defendant's likelihood of future criminal conduct—was a critical factor to consider in

the imposition of a sentence."); *Pepper*, 562 U.S. at 491 ("[P]ostsentencing

rehabilitation may be highly relevant to several of the § 3553(a) factors.") The

government's complete dismissal of the Probation Office's approach is unwarranted

and improper, punishes Mr. Avenatti for appealing, and this Court should reject it.

### III. THE GOVERNMENT VASTLY OVERREACHES BY FOCUSING ON UNRELATED CONDUCT AND UNSUBSTANTIATED CLAIMS

Lacking any legitimate justification for its extreme increased sentence, the

government resorts to challenging the Guidelines based on unrelated, unproven matters,

and attempts to recast routine, good-faith litigation by Mr. Avenatti and his counsel as

somehow blameworthy. The Court should reject this approach.

### A.    Erroneous Claim that Mr. Avenatti's Criminal History is Understated

Despite the Ninth Circuit's clear directive that the *Clifford* case is relevant

conduct—not prior criminal history—and despite its admission of that fact, the

government now asserts that Criminal History Category II "substantially

underrepresents the seriousness of [Mr. Avenatti's] criminal history or the likelihood

1    that [he] will commit other crimes," and seeks an upward departure. (Dkt. 1214 at 22)

2    (citing U.S.S.G. § 4A1.3(a)(1).) In so arguing, it contends that Criminal History

3    Category II—though the correct category—supposedly does not reflect alleged

4    "criminal violations that led to the Court revoking [Mr. Avenatti's] bail," alleged

5    "failure-to-file and failure-to-pay tax offenses," alleged "embezzlement from 200

6    clients who had brought a class action against the NFL," and the conduct in *Clifford*,

7    which the Ninth Circuit already concluded was part of the conduct in the instant case.

8    (*Id.* at 22-23.)

9    　　　This argument has no merit. As an initial matter, *Clifford* cannot support an

10    upward departure because—as the government concedes—it is already part of the

11    conduct giving rise to Criminal History Category II. A court cannot depart upward

12    under U.S.S.G. § 4A1.3 based on conduct for which the defendant has already been

13    assessed criminal history points. *United States v. Bad Marriage*, 392 F.3d 1103, 1111

14    (9th Cir. 2004) ("[A] sentencing court c[an] not depart upward based on the nature of a

15    defendant's crimes already assigned criminal history points," and "[a] factor already

16    calculated into a sentence under the guidelines may not be a proper basis

17    for departure.") (internal citation and quotation omitted).[3]

18    　　　Nor can the other unproven, unsubstantiated allegations support an upward

19    departure. An upward departure "is appropriate only in an unusual case, because the

20    criminal history category of the sentencing guidelines is designed expressly to account

21    for a defendant's prior criminal conduct." *United States v. Carrillo-Alvarez*, 3 F.3d 316,

22    320 (9th Cir. 1993). Section 4A1.3-based upward departures must be based on "reliable

23    information," U.S.S.G. § 4A1.3(a)(1), and the commentary provides examples of

24

25

26

27    　　　[3] This aspect of the government's argument for understated criminal history is
also based on the way Mr. Avenatti was charged by the Department of Justice in three
separate cases within approximately 60 days, as detailed in the original sentencing

28    position, (Dkt. 1016; Dkt. 16 [3/22/19 Complaint in this case]; PSR ¶¶ 201 [citing
3/25/19 charging in *Nike* case and 5/28/19 initial appearance in *Clifford* case],)

5

adequate circumstances for a departure, including actual sentences supported by factual

development and findings. These include:

(i)    A previous foreign sentence for a serious offense.

(ii)   Receipt of a prior consolidated sentence of ten years for a series of serious
assaults.

(iii)  A similar instance of large scale fraudulent misconduct established by an
adjudication in a Securities and Exchange Commission enforcement
proceeding.

(iv)  Commission of the instant offense while on bail or pretrial release for another
serious offense.

U.S.S.G. § 4A1.3, cmt. n.2. Due process also requires sentencing information to meet a

threshold level of reliability and trustworthiness. *United States v. McGowan*, 668 F.3d

601, 606-07 (9th Cir. 2012); *United States v. Franklin*, 18 F.4th 1105, 1124-25 (9th Cir.

2021). Although hearsay may be admissible at sentencing, "[d]ue process requires that

some minimal indicia of reliability accompany a hearsay statement." *United States v.*

*Petty*, 982 F.2d 1365, 1369 (9th Cir.) *as amended by* 992 F.2d 1015 (9th Cir. 1993); *see*

*also* U.S.S.G. § 6A1.3(a) (requiring "sufficient indicia of reliability to support [the]

probable accuracy" of information considered at sentencing).

      The government's unproven, untried allegations about the NFL, tax payments,

and bail revocation fall far short of this standard, and it would violate Mr. Avenatti's

due process rights for this Court to rely on them to determine his sentence. Mr.

Avenatti was never convicted of, nor tried for, any of this alleged conduct, and the tax-

related counts were all dismissed. The only sources of information provided regarding

the NFL allegations—PSR ¶ 191—are unsubstantiated government-created flowcharts

(Gov. Trial Exs. 451-55), and unauthenticated out-of-court statements. (Dkt. 822, Ex. I

(Regnier MOI); *In re Eagan Avenatti*, LLP, no. 18-cr-1644, Dkt. 51, Exs. 32-34.) The

tax payment information is equally tenuous: it consists of double or triple hearsay: an

affidavit by a government agent recounting alleged prior interview statements by IRS

revenue officers about statements by other individuals who never testified at trial, many

of whom are not identified by name (only initials), and who Mr. Avenatti never had any

6

1   opportunity to cross-examine. (*See* Docket no. 1, Complaint, pages 12-81; 2/22/19

2   Affidavit of Raymoun Karlous). And the PSR's allegations about tax payments appear

3   largely taken from the Indictment (which is not evidence). (*See* PSR ¶¶ 94-100; Dkt. 16

4   [Indictment] at 25-27.)

5           Reliance on such unsupported hearsay would violate Mr. Avenatti's "due process

6   right not to be sentenced on the basis of materially incorrect" or unreliable information.

7   *United States v. Huckins*, 53 F.3d 276, 279 (9th Cir. 1995) (cleaned up); *United States*

8   *v. Kerr*, 876 F.2d 1440, 1446 (9th Cir. 1989) ("The mere statements of an anonymous

9   informant, standing alone, do not bear sufficient indicia of reliability to support a

10  finding of fact by even a preponderance of the evidence.") Sentencing evidence is

11  insufficiently reliable to satisfy due process when its use would require the defendant to

12  "prove a negative" without corroborating evidence the defendant can cross-examine,

13  and the government's evidence lacks "other, independently obtained" support.

14  *Franklin*, 18 F.4th at 1124-25; *see also United States v. Hanna*, 49 F.3d 572, 577 (9th

15  Cir. 1995); *McGowan*, 668 F.3d at 606-07. The Ninth Circuit has held sentencing

16  courts are categorically barred from basing factual findings solely on uncorroborated

17  hearsay statements of unidentified declarants. *Kerr*, 876 F.2d at 1446.

18          But that is what the government impermissibly asks this Court to do here: make

19  findings to support an upward departure based on double-or-triple hearsay statements

20  of unidentified individuals from a government report, who never testified at trial.

21  "Cross examination is the 'gold standard' of procedural reliability," *Franklin*, 18 F.4th

22  at 1126 (internal citation omitted), but Mr. Avenatti had no chance to undertake it—or

23  even determine who the declarants were. It would be fundamentally unfair and

24  impermissible for this Court to sentence Mr. Avenatti based on such evidence. *United*

25  *States v. Ponce*, 51 F.3d 820, 828–29 (9th Cir. 1995) (reversing an upward departure

26  based on a DEA report because there was "no evidence in the record corroborating the

27  double-hearsay statements contained in the DEA report," and "due process requires that

28  [hearsay] statements be corroborated by extrinsic evidence"). Relying on such murky

7

1    allegations would impermissibly force Mr. Avenatti to "prove a negative"—that he did

2    not do the things the hearsay declarants purportedly claim in the government's report—

3    while depriving him of any opportunity to test the basis of their claims.

4         The government has the burden to prove conduct supporting an upward departure

5    at sentencing. *United States v. Pham*, 545 F.3d 712, 720 (9th Cir. 2008). It has failed to

6    do so; indeed, it opposed Mr. Avenatti's prior request for an evidentiary hearing on

7    sentencing issues. (Dkt. 1034). The government's unsupported and unreliable

8    allegations are not justification to depart upwards from the Guideline range.

9    **B.    Erroneous Miscasting of Good-Faith Litigation as Misconduct**

10        Even more specious is the government's claim that Mr. Avenatti's mere act of

11   advocating his position in this and other cases is somehow improper, reflects disregard

12   for his former clients, or suggests a danger of recidivism. (Dkt. 1214 at 32 & n.17.) Mr.

13   Avenatti has a constitutional right to defend himself, including by ensuring the

14   restitution award is accurate. Yet the government claims he somehow acted improperly

15   by "fil[ing] objections with the State Bar of California" to amounts clients sought as

16   restitution (for which Mr. Avenatti would ultimately be responsible), and criticizes him

17   for opposing premature release of restitution amounts while the Ninth Circuit reviewed

18   them on appeal—a prudent position with which this Court agreed. (*Id.* at 32; Dkt. 1092

19   (order denying government request for immediate release of funds after the defense

20   opposed it due to pending appeal, Dkt. 1089, 1088.) These claims are unfounded.

21        Had Mr. Avenatti not objected to, or moved to stay, the restitution amount, the

22   government would undoubtedly claim he had waived his right to contest it. But

23   restitution "affect[s] [his] substantial rights and the fundamental fairness of the

24   proceeding," *see United States v. Anderson*, 741 F.3d 938, 954 (9th Cir. 2013), and he

25   is entitled to advocate for a correct determination. It would be inappropriate to penalize

26   him at sentencing for exercising his right to litigate this important issue.

27

28

                                            8

**C.    Unsupported Claim that Mr. Avenatti Made "Baseless Allegations"**

Lacking any legitimate basis to claim Mr. Avenatti has engaged in misconduct since his prior sentencing, the government lobs vague assertions that he has made "false statements" and "baseless accusations" against government counsel and others in various proceedings. (Dkt. 1214 at 32-33.) Without even attempting to show Mr. Avenatti's statements are false, the government derides as "baseless" Mr. Avenatti's statement in a 2024 deposition that "I think there's significant *Brady* issues and other misconduct [in this case] by" the government, Filippo Marchino, Jason Frank, and Andrew Stolper. (*Id.*; Gov. Ex. 3 at 27 .) It complains, without elaboration or support, that Mr. Avenatti "baselessly accuse[s] countless people of criminal and unethical behavior while simultaneously providing false testimony." (Dkt. 1214 at 33.)

But nothing—beyond government counsel's say-so—actually substantiates the claim that Mr. Avenatti's statements are false. If anything, the record *supports* them. "*Brady* violations" did, in fact, occur in Mr. Avenatti's trial: a mistrial was granted because the government failed to produce material evidence in its possession. *See* Dkt. 780; Dkt. 867 at 4 (this Court saying "I found a *Brady* violation with respect to a very important range of documents"). Regarding Mr. Marchino, former special litigation counsel for the bankruptcy trustee in the bankruptcy case alleged that "[a]ccording to [the bankruptcy trustee], the USAO sought to delay [the trustee]'s pursuit of . . . $4 million [from the City of Pasadena] to keep the criminal proceedings against Mr. Michael Avenatti 'separate'," and that "Mr. Marchino, a witness in [Mr. Avenatti's] criminal proceedings on whom the USAO was relying, directly benefited from the delay (because it allowed him to obtain access to the $4 million). The net result of the requested delay was, in effect, a $4 million payment to Mr. Marchino, a witness in Mr. Avenatti's criminal proceeding (the '$4 Million Payoff.')." *In re Eagan Avenatti*, LLP, 8:19-bk-13560-SC, Dkt. 525 at 1-2. The pleading further alleges that "[b]ecause the $4 million had not been 'paid,' but instead was not timely pursued, the USAO apparently took the position that it had no obligation to disclose the $4 Million Payoff to Mr.

9

1  Avenatti or to District Judge Selna, the presiding judge in Mr. Avenatti's pending

2  criminal proceeding." (*Id.* at 2.) Whether or not these allegations are true, they are not

3  "baseless," and Mr. Avenatti is not the only one raising concerns.

4         Further supporting Mr. Avenatti's claim of "misconduct," government attorneys

5  were held in contempt in the Eagan Avenatti bankruptcy proceeding after the

6  bankruptcy court concluded in a published order that they had violated the bankruptcy

7  court's order directing one of their agents to answer questions at a deposition. *See In re*

8  *Eagan Avenatti*, 659 B.R. 214, 218 (C.D. Cal. May 7, 2024) ("Following the initial

9  deposition where the Trustee's counsel encountered significant disruption of the

10  deposition by counsel for the United States… [the Court found] that the United States

11  acted in contempt of the Court's [prior] August 1 2023 Order[.]"). The bankruptcy

12  trustee's motion to hold government counsel in contempt stated that government

13  representatives "knowingly and repeatedly violated a clear order of this Court without

14  any justification, inflicting needless expenditure of time and money on the Estate and

15  other parties, blocking the Trustee from obtaining the testimony to which the Court has

16  held he is entitled, and showing a disrespect for this Court that is deeply disturbing

17  (particularly in federal employees)." *Marshack v. Eisenhower Carlson PLLC*, 8:20-ap-

18  01059-SC (Docket no. 137 at 15.) That the trustee himself criticized the government's

19  conduct, and the bankruptcy court found government counsel in contempt, shows Mr.

20  Avenatti's allegations of misconduct are—at minimum—not "baseless."

21         Equally meritless is the government's attack on Mr. Avenatti for sending an

22  August 2024 letter apprising the government of a $19 million verdict that Passport 420,

23  LLC, had received and stating that Mr. Avenatti "may be entitled to approximately $9.5

24  million of this amount through A&A's ownership stake in Passport 420." (Dkt. 1214 at

25  34; Gov. Ex. 11.) The government fails to explain what about this letter is

26  objectionable. The letter did not say Mr. Avenatti was, in fact, entitled to any amount of

27  the verdict; only that he "may" be entitled to funds "through A&A's ownership

28

10

1    stake in Passport 420." (Gov. Ex. 11 at 3.) Though the government alleges Mr. Avenatti

2    gave up his interest in Passport 420 in connection with his divorce (Dkt. 1214 at 34),

3    the letter references *A&A*'s stake. And even assuming he did forfeit his interest in

4    Passport 420, that fact would merely negate any obligation he would have had to apply

5    that money to restitution; either way, Mr. Avenatti gained no advantage from sending

6    the letter. Indeed, it was explicitly sent to *comply with*—not evade—his obligations

7    under 18 U.S.C.§ 3664(k) and (n) to disclose any potential assets so his victim-clients

8    can be compensated. (Gov. Ex. 11.) Nor did the government ever object to the letter.

9    ## IV. THE GOVERNMENT'S LOSS ARGUMENTS ARE ERRONEOUS

10            The government also contravenes the Ninth Circuit's order by continuing to

11    claim Mr. Avenatti's 7.5 percent fee pertained only to the cash he obtained for Ms.

12    Phan and not for any other asset. (Dkt. 1214 at 16-17.) The Ninth Circuit clearly held it

13    was broader than that, extending to any "business interest" or other asset he obtained

14    for her. *United States v. Avenatti*, 2024 WL 4553810 at *2 (9th Cir. Oct. 23, 2024)

15    ("The record is clear that the acquisition of Em Cosmetics was central to Phan's

16    divestment from Ipsy, and Avenatti's retainer agreement with Phan entitled him to a fee

17    of 7.5% of the value of Em Cosmetics.") The other assets Mr. Avenatti obtained for her

18    were included in the contract's definition of "recovery," which entitled him to a 7.5

19    percent fee that must be considered in the loss calculation.[4]

20    ## V. THE OBSTRUCTION OF JUSTICE ENHANCEMENT IS INVALID

21            Mr. Avenatti addresses the obstruction of justice enhancement here to discuss

22    additional evidence cited in the government's Sentencing Memorandum, which he did

23    not previously address. The government alleges, *inter alia*, that Mr. Avenatti falsely

24

25    ─────────────────────

26            [4] The government also erroneously suggests it is the defense's obligation to prove the loss amount. (Dkt. 1214 at 17.) It is the *government* that must prove loss, on a but-for analysis, to establish the § 2B1.1 enhancement. *Pham*, 545 F.3d at 720. Mr.

27    Avenatti also reiterates his objection to restitution amounts for fees and costs incurred by any party in connection with civil matters. (Docket no. 1211 at 30 n.14.) This

28    applies to such fees and costs sought by any party, not only those sought by third parties. *Lagos v. United States*, 584 U.S. 577, 580-81 (2018).

1    testified in a March 22, 2015 Judgment Debtor Exam that Ms. Phan had not accused

2    him of "stealing her $4,000,000," and that "Trial Exhibits 288, 290-293 show that

3    defendant's assertion that Phan had not accused [him] of theft was false and [he] knew

4    it was false because [he] knew Phan had gone to the police to accuse defendant of theft

5    in November 2018, four months earlier." (Dkt. 1214 at 12.)

6        But the referenced exhibits fail to show this. Exhibit 288, an August 6, 2018

7    letter from Ms. Phan's counsel, accuses Mr. Avenatti not of stealing, but of retaining

8    Ms. Phan's money in a client trust account. (Gov. Tr. Ex. 288) ("To date, Ms. Phan's

9    funds have not yet been delivered, and are presumably still in the Michael J. Avenatti,

10   Esq . Attorney Client Trust Account."). And Exhibits 290-93 are emails from Judy

11   Regnier to Mr. Avenatti transmitting attachments or saying the Newport Police

12   Department called about wires to Ms. Phan; not accusations of theft.

13       The government further claims "Trial Exhibits 37 and 408 show that the

14   settlement agreement in Johnson's matter that defendant claimed was not the actual

15   settlement agreement was, in fact, the finalized settlement agreement." (Dkt. 1214 at

16   12.) Exhibit 408 is marked Exhibit 60, which the transcript of the testimony indicates

17   Mr. Avenatti was shown. But without testimony about the circumstances under which

18   he viewed that document—four years after its signing—it is impossible to conclude he

19   willfully testified falsely that he did not believe it was the entire settlement.

## VI. CONCLUSION

21       For the foregoing reasons, Mr. Avenatti requests that this Court sentence him to

22   39 months: 78 months less the 39 months, 20 days he will have served on *Clifford*.

23                                    Respectfully submitted,

24                                    CUAUHTEMOC ORTEGA
                                      Federal Public Defender

25   DATED:  May 16, 2025             By   */s/ Margaret A. Farrand*

26                                    MARGARET A. FARRAND
                                      ADITHYA MANI
27                                    Deputy Federal Public Defenders
                                      Attorney for MICHAEL J. AVENATTI
28